**Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellant,**

v.

**ALL STATE BOILER, INC., Appellee.**

**ALL STATE BOILER, INC., Appellant,**

v.

**Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.**

Nos. 96–1093, 96–1094.

United States Court of Appeals, Federal Circuit.

June 25, 1998.

John K. Lapiana, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Togo D. West, Jr., Secretary of Veterans Affairs. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Assistant Director.

Timothy T. Corey, Pepe & Hazard, LLP, of Hartford, Connecticut, argued for All State Boiler, Inc. With him on the brief was Richard F. Wareing.

Before MAYER, Chief Judge, MICHEL, and SCHALL, Circuit Judges.

MICHEL, Circuit Judge.

This appeal and cross-appeal require us to re-examine and clarify the legal test a contractor must satisfy to recover unabsorbed overhead expenses that result from a government-caused suspension in contract performance. The government appeals the final decision by the Veterans Affairs Board of Contract Appeals (the "Board") in *All State Boiler, Inc.*, VABCA No. 4537 (July 6, 1995), arguing that the Board misconstrued the legal test by requiring All State Boiler, Inc. ("All State") to show only that it would have been impractical, rather than impossible, to take on replacement, rather than additional, work before awarding All State its overhead costs using the *Eichleay* formula. All State cross-appeals, contending that it should have recovered its unabsorbed overhead costs for the entire fifty-eight day duration of the government-caused suspension rather than only for the twenty-two days beyond the contract deadline by which performance continued as a result of that suspension. We conclude that the Board correctly required proof of replacement, not additional, work, and properly awarded All State its unabsorbed overhead costs for only the additional time required to complete performance of the contract. We therefore deny both the appeal and cross-appeal, and affirm the Board's decision. In doing so, we clarify the showing

that must be made by a contractor to justify *Eichleay*-based recovery and what is required from the government to rebut a *prima facie* case of entitlement.

## BACKGROUND

All State was awarded a construction contract worth $1,354,285 to upgrade the boiler system in the Veterans Affairs ("VA") Medical Center in Northampton, Massachusetts. The contract involved the demolition and removal of three existing boilers and the installation of new boilers and plumbing, in eight separate phases. The completion dates for each of the eight phases of work were to be established by All State and the Contracting Officer's Technical Representative (the "COTR"). All State received the Notice to Proceed on January 13, 1994. The initial deadline for completion of the contract was 360 days, or January 5, 1995, but that date was extended to February 7, 1995, for reasons unrelated to this appeal. The contract also contained a standard Suspension of Work clause, pursuant to 48 C.F.R. § 52.212–12 (1994), as follows:

> If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract ... an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

The contract specifications required All State to obtain prior approval of all major equipment, material, and subcontractor selections within sixty days of the date of the contract award by filing "submittals." On February 2, 1994, however, All State sent the VA a proposed construction schedule which specified that all submittals would be provided within 108 days. Furthermore, the specifications required that the boiler renovation be scheduled to permit operation of the plant with one spare boiler available at all times. All State's proposed construction schedule predicted early completion of the project—within 270 days—based on the use of temporary boilers during construction. The VA rejected the proposed schedule because of the extended deadline for the required submittals and especially because of the proposed use of temporary boilers. All State provided seven alternative construction schedules, but no schedule was ever approved by the VA. Furthermore, the VA never received all of All State's submittals. Nonetheless, the VA allowed All State to begin demolition and disassembly of the boilers on March 28, 1994.

On the second day of demolition, All State discovered what it believed to be asbestos in the casing of one of the boilers. The contract made no provision for dealing with asbestos; the VA therefore requested separate bids for the asbestos abatement work. All State did not bid on the abatement contract. The VA declined All State's offer to continue performance out-of-sequence and suspended all work on the contract.

Performance resumed on the contract on May 28, 1994, after a fifty-eight day suspension. All State eventually completed the contract on March 1, 1995, twenty-two days after the amended deadline.

On June 2, 1994, All State submitted a claim to increase the amount of the contract by $55,739.74, based on costs associated with the temporary suspension of work. On August 30, 1994, All State revised its claim to $39,962. The Contracting Officer (the "CO") obtained an audit of the claim, which established a daily overhead rate of $718. In a final decision on November 17, 1994, the CO awarded to All State the costs of operational rentals during the suspension of the contract work—a total of $522—and denied the remainder of the claim, including the request for unabsorbed overhead expenses.

All State appealed to the Board. Before the Board, All State and the VA stipulated that All State was further entitled to $9,628 in direct field costs and salaries that accrued during the suspension of work. Thus, the only issue before the Board was whether All State was entitled to recover unabsorbed home office expenses. The Board concluded that All State had successfully demonstrated that All State was required to "stand by" during the government-caused suspension and that it was "impractical" for All State to take on additional work during that period.

*See All State Boiler,* slip op. at 15–20. Specifically, the Board made the following findings of fact with respect to All State's ability to take on additional work:

> During the suspension of work, [All State] had approximately $5 million of additional bonding capacity and continued to actively bid for new work. [All State], as a matter of its deliberate business practice, maintained its work-on-hand volume at approximately half of its bonding capacity. Although [All State] bid several jobs smaller than those for which it would typically compete during the suspension period in an effort to generate revenue, it was *impractical for [All State] to bid, obtain contracts, and begin work on new projects in the 58 day period of the suspension.* In general, however, [All State] was not prevented from bidding on new projects by reason of the suspension of work.

*Id.* at 7 (emphasis added). The VA argued to the Board that the second prerequisite to *Eichleay* recovery requires a contractor to demonstrate that it was not just *impractical* but *impossible* for it to take on additional work. The Board reviewed Federal Circuit law and determined that the government had overstated the requirement, noting that the "VA's expression of the second prerequisite ... is contrary to the [Federal Circuit's] holdings and would impermissably [sic] restrict the ability of Federal construction contractors to recover the costs of unabsorbed overhead expenses to which they are entitled under Federal contract law." *Id.* at 16. The Board concluded that the second prerequisite merely "requires that the claimant demonstrate that it was *impractical* to obtain other work during the delay period." *Id.* at 18 (emphasis added). Furthermore, the Board hypothesized that:

> [N]o reasonably healthy and prudent contractor[ ] would be able to establish that it was unable to take on additional work during an entire contract period. Under the VA's analysis, *Eichleay* could be used only in two extremes: when a contractor is in such a precarious state, or when a contractor's business [is] so good, that it has no available bonding capacity for the entire contract performance period, and therefore it could take on no additional work. Such

an interpretation does not make business sense.

*Id.* at 19. The Board separately concluded that All State had failed to demonstrate that it would have completed the contract work early but for the government-caused suspension. *See id.* at 12. The Board therefore awarded All State its unabsorbed overhead costs for the twenty-two days beyond the deadline that proved necessary to complete the contract, based on the auditor's daily overhead rate, totaling $15,796. *See id.* at 21.

The government appeals from this decision, arguing that the Board applied the incorrect legal test to determine whether costs should be awarded under the *Eichleay* formula, arguing as it did before the Board that the contractor must show it was impossible— not just impractical—for it to take on additional work as a result of the suspension. All State cross-appeals, arguing that the Board improperly awarded indirect costs for only the twenty-two day extension of the performance period rather than for the full fifty-eight days of the suspension. The notices of appeal and cross-appeal as to the appropriateness of the Board's *Eichleay* award were timely filed, and this case was submitted for our decision following oral argument on March 5, 1998. We have jurisdiction over a final decision by a board of contract appeals pursuant to section 8(g)(1) of the Contract Disputes Act of 1978, codified at 41 U.S.C. § 607(g)(1) (1994), and 28 U.S.C. § 1295(a)(10) (1994).

## DISCUSSION

### I. Standard of Review

■ Although we review a Board decision on a question of law *de novo,* we may only overturn Board fact-finding that is arbitrary and capricious, unsupported by substantial evidence, fraudulent, or so erroneous as to imply bad faith. *See* 41 U.S.C. § 609(b) (1994); *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1577 (Fed.Cir.1994). Nonetheless, even on issues of law we give careful consideration to the Board's legal conclusions in recognition of its "considerable experience in construing government contracts." *Wick-*

*ham,* 12 F.3d at 1577 (citing *United States v. Lockheed Corp.,* 817 F.2d 1565, 1567 (Fed. Cir.1987)). We therefore review the Board's interpretation of the legal tests for recovery of unabsorbed overhead expenses as a question of law; its decisions with respect to the underlying facts related to those legal tests shall be upheld unless we conclude they are not supported by substantial evidence.

## II.   Unabsorbed Overhead and the Use of the *Eichleay* Formula

The bid price of a government contract incorporates any anticipated expenses arising from the performance of that contract, such as construction wages and equipment rental, to be incurred by the contractor. These are direct costs, because they arise solely because of and are attributable directly to performance of a specific contract. In addition, a government contractor incurs indirect costs which are not attributable to one contract in particular but arise because of its general operations. Indirect costs are usually those costs that are "incurred despite construction inactivity on a project, such as home office overhead including accounting and payroll services, general insurance, salaries of upper level management, heat, electricity, taxes, depreciation." *Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1058 (Fed. Cir.1993). A contractor recovers its indirect costs by allocating them on a proportionate basis among all of its contracts. *See Mech–Con Corp. v. West,* 61 F.3d 883, 886 (Fed.Cir. 1995). In *Eichleay Corp.,* ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, 1960 WL 538 (1960), the Armed Services Board of Contract Appeals explained that:

> [I]t must be borne in mind that overhead costs, including the main office [or home office] expenses involved in this case, cannot ordinarily be charged to a particular contract. They represent the cost of general facilities and administration necessary to the performance of all contracts. It is therefore necessary to allocate them to specific contracts on some fair basis of proration.

*Id.* at 13,574.

Where the government suspends performance of a contract, the contractor's indirect costs, such as home office expenses, often accrue beyond the amount originally allocated to that particular contract. These additional indirect costs may thus be "unabsorbed." The Court of Claims consistently allowed a contractor to recover not only additional direct costs that accrue to a contract where completion of performance is delayed by the government, but also any *unabsorbed,* indirect costs that result. *See Fred R. Comb Co. v. United States,* 103 Ct.Cl. 174, 184 (1945) (holding that where the proportionate salary of home office staff attributable to a contract is "wasted" because of a suspension by the government, the government is obligated to reimburse the contractor for that waste); *see also B–W Constr. Co. v. United States,* 104 Ct.Cl. 608, 643–44, 1945 WL 4016 (1945) (charging proportionate amount of home office overhead to government); *Brand Inv. Co. v. United States,* 102 Ct.Cl. 40, 44, 58 F.Supp. 749 (1944) ("We are allowing the plaintiff a proportionate part of its main office overhead."). The Armed Services Board of Contract Appeals adopted a specific formula for estimating proportionate home office overhead that may be unabsorbed due to a suspension:

> Appellant has based its claim on an allocation of the total recorded main office expense to the contract in the ratio of contract billings to total billings for the period of performance. The resulting determination of a contract allocation is divided into a daily rate, which is multiplied by the number of days of delay to arrive at the amount of the claim. This method of computation relies primarily on the duration of the suspension as the criterion for allocating the contract expenses of the main office.

*Eichleay Corp.,* ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, 13,574 (1960). The Federal Circuit endorsed this formula—the "*Eichleay* formula"—as the appropriate method to calculate recoverable (that is, unabsorbed and indirect) costs after a suspension of performance caused by the government. *See C.B.C. Enters., Inc. v. United States,* 978 F.2d 669, 674 (Fed.Cir.1992) ("[W]hen disruption, suspension or delay caused by the government has reduced the stream of direct costs in a contract, it is appropriate to use the *Eichleay* formula to calculate extended home office overhead.");

*Capital Elec. Co. v. United States,* 729 F.2d 743, 746–47 (Fed.Cir.1984). Indeed, the Federal Circuit has explicitly held that the *Eichleay* formula is the *only* means for calculating the amount of recovery of such indirect costs. *See Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1580–81 (Fed.Cir. 1994). Thus, while it is undisputed that the *Eichleay* formula is the appropriate method for measuring the amount of All State's recovery of its unabsorbed overhead expenses incurred because of the government-caused delay, it is less clear what must be shown to justify All State's entitlement to such recovery. It is therefore All State's entitlement to recovery under the *Eichleay* formula that is the subject of dispute in this appeal.

### III. The Legal Test for Recovery Under the *Eichleay* Formula

■ This appeal and cross-appeal involve the correct interpretation of the legal tests to which we hold government contractors who seek to recover unabsorbed overhead. We have adopted "two prerequisites to application of the *Eichleay* formula to recover unabsorbed overhead ... (1) that the contractor be on standby and (2) that the contractor be unable to take on other work." *Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1056 (Fed.Cir.1993). The showing required under each of these two "prongs" is discussed below.

#### A. The First Prong: The Standby Test

■ Much attention has been paid to what constitutes "standby" during a government-caused delay in performance. Our case law suggests that a contractor is on "standby" when work on a project is suspended for a period of uncertain duration and the contractor can at any time be required to return to work immediately: "The proper standby test focuses on the delay or suspension of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform." *Id.* at 1058. *Compare, e.g., Daly Constr., Inc. v. Garrett,* 5 F.3d 520, 522 (Fed.Cir.1993) (noting that the contractor was required to show, *inter alia,* that "it was required reasonably to stand by during the period of delay without staff reduction" to recover under *Eichleay) with Mech–Con Corp. v. West,* 61 F.3d 883, 887 (Fed.Cir.1995) (disallowing a portion of the

contractor's *Eichleay* recovery because the government had allowed the contractor a three-month period in which to "remobilize" after the instruction to resume work was given). In this appeal, there is no dispute that All State was on standby status during the entire fifty-eight day suspension ordered by the government.

#### B. The Second Prong: Impracticality of Obtaining Replacement Work

Less clear, according to the government, is the second requirement for *Eichleay* recovery. The government renews on appeal the argument it made before the Board. The government contends, first, that the contractor is required to demonstrate it was impossible—not merely impractical—for it to take on additional work which could have otherwise absorbed its home office expenses. Second, it suggests that a contractor's ability to perform *any* "additional" work will defeat recovery under *Eichleay.* We examine the government's arguments regarding the formulation of this test below.

#### 1. Impracticality versus Impossibility

■ The government's argument is based primarily on language used by this court in other cases involving the recovery of unabsorbed overhead expenses. The government, in fact, challenges the Board's assertion that our opinions in this area have suffered from an "occasional imprecise use of language," *All State,* slip op. at 16, pointing to the consistency with which it claims we have required a contractor to show it was "unable" to take on additional work. The government equates our phrases "unable" or "could not" with "impossible" for purposes of the second prong of the test. It suggests, therefore, that the Board, by focusing on whether it was "impractical" for All State to obtain additional work, impermissibly relaxed the necessary showing we have required from government contractors before allowing recovery under *Eichleay.*

We believe, however, that despite the language cited by the government, its argument is not persuasive. At the outset, we note that none of the cases cited by the govern-

ment even included a careful analysis of the required showing under the second factor. For example, the government cites *Capital Electric Co. v. United States,* 729 F.2d 743 (Fed.Cir.1984), in which we noted that the contractor had "introduced *unrebutted* evidence that it could not have taken on any large construction jobs during the various delay periods." *Id.* at 745 (emphasis added). Because the evidence was unrebutted in that case, we did not consider the specific terms of the contractor's burden of proof as to its ability to take on additional work.

Other decisions relied on by the government mention the analysis required under the second prong of the test, but our resolution of these appeals did not depend on our consideration of the exact proof required to satisfy that second prong. For example, the government relies on *C.B.C. Enterprises v. United States,* 978 F.2d 669 (Fed.Cir.1992), in which we required the contractor to demonstrate that it *"could not have* taken on any other jobs during the contract period." *Id.* at 674 (emphasis added). Later in the very same opinion, however, we explained that when "delays are sudden, sporadic and of uncertain duration," it may be *"impractical* for the contractor to take on other work." *Id.* at 675 (emphasis added). Thus, *C.B.C.* seems to support both the government's position and All State's. The government also cites language from *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575 (Fed. Cir.1993), in which we noted that a contractor, in part, must "demonstrate[ ] that it *could not have* taken on any other jobs during the contract period." *Id.* at 1582 (emphasis added). In that case, however, we did not even reach the second prong because we concluded the contractor had not been on standby and thus recovery was precluded under the first prong. *See id.* Similarly, in *Interstate General Government Contractors, Inc. v. West,* 12 F.3d 1053 (Fed.Cir.1993), although we noted that a contractor must show that it was "unable to take on other work," *id.* at 1056, the real issue in the case was whether a contractor who completed performance on time according to the contract deadline but had intended to finish early could still recover *Eichleay* damages after a government suspension of work prevented such early completion, *see id.* at 1058–

61. Our review of the other cases cited by the government reveals a similar lack of attention and decision relevant to the issue raised here. Rather, the government relies not on holdings, but solely on *dicta.* We are therefore not convinced that we have ever required a contractor to demonstrate that it was impossible, rather than impractical, for it to take on additional work to absorb the additional indirect costs that accrued because of the government-ordered suspension of work.

We agree that, although we have recently taken some steps to explain the requirements of the second prong, further clarification is necessary. At a minimum, we note that the language we have used with respect to the second prong has been vague regarding the time periods involved in determining *Eichleay* recovery. To rectify this problem, we will refer to the period during which the government stops work on the contract as the "suspension period," and to the additional time beyond the original deadline necessary to complete performance of the contract, as a result of the suspension period, as the "extension period." Our use of "delay" in our *Eichleay* formula opinions is confusing because it fails to distinguish between these two different periods of "delay" which can result from a government-ordered suspension of work.

On the other hand, we do not agree with the government's characterization of what the legal test for *Eichleay*-based recovery should be. In *Mech–Con Corp. v. West,* 61 F.3d 883 (Fed.Cir.1995), we re-examined the showing a contractor must make to receive compensation for its unabsorbed indirect costs under the *Eichleay* formula. In that case, we explained that a contractor could establish a *prima facie* case for recovery by demonstrating "that the government required a contractor to remain on 'standby' and the government imposed delay was 'uncertain.'" *Id.* at 886. By making this showing, the contractor has thus implicitly demonstrated that the additional overhead was not and could not be absorbed.

We noted, however, that this *prima facie* case can be rebutted by the government with "evidence or argument showing that the con-

tractor did not suffer or should not have suffered any loss because it was able to either reduce its overhead or take on other work during the delay." *Id.* We then concluded that the government failed to meet its burden; we also noted that the government's reliance on the minimal amount of work remaining on the contract when the suspension occurred was misplaced, for the "amount of work remaining on a suspended contract is essentially irrelevant if a contractor must leave its resources idle in order to be able to complete that work on short notice." *Id.* at 887. We thus concluded that a portion of the contractor's unabsorbed overhead costs should have been awarded.[1]

Since our decision in *Mech–Con*, we have had two further opportunities to examine the nature of the evidence that would satisfy the government's rebuttal burden under the second prong. In *Altmayer v. Johnson*, 79 F.3d 1129 (Fed.Cir.1996), after determining that the contractor was on standby during a government-caused suspension, we examined whether the government had provided sufficient evidence to rebut the contractor's *prima facie* showing of entitlement to recovery of indirect costs. In an attempt to show that "other work" had been performed despite the suspension, the government in part relied on the contractor's total billings between August 31, 1992, and May 28, 1993, the period of time covering performance of the contract at issue. We concluded, however, that this evidence "[did] not show that [the contractor] performed *additional work to absorb its extended home office overhead.*" *Id.* at 1135 (emphasis added). We also concluded that neither the contractor's bidding on new contracts as completion of the contract at issue approached nor the fact that the contractor had excess bonding capacity during the suspension period precluded recovery of indirect costs using the *Eichleay* formula. *See id.* Because the contractor had made the requisite *prima facie* showing and the government had failed to rebut the showing, we vacated the Board's denial of recovery. *See id.*

The only other case in which we have carefully examined the second prong of the legal test for *Eichleay* damages was *Satellite Electric Co. v. Dalton,* 105 F.3d 1418 (Fed. Cir.1997). In that case, we noted that:

> Throughout the period of suspension, Satellite bid on new contracts.... Satellite obtained only two contracts. Satellite's inability to obtain new contracts resulted partially from limitations in its bidding bond, unrelated to the contract at issue, that restricted the number and type of contracts upon which it could bid, and partially from economic conditions that made it difficult to bid competitively for new contracts.

*Id.* at 1420. We then noted that "[t]he contractor is entitled to damages ... *only* if its inability to take on additional work results from its standby status, i.e., is attributable to the government." *Id.* at 1421 (emphasis added). We concluded that Satellite was not entitled to recover its indirect costs after first distinguishing *Altmayer:*

> In *Altmayer v. Johnson* this court, in reversing a Board of Contract Appeals decision denying *Eichleay* damages, stated that the fact that the contractor "may have bid on other contracts 'at the very end' of the subject contract, does not establish that it was able to reduce its overhead or take on other work during the delay." In the present cases ... however, the evidence that Satellite was able to take on other work was far more than its bidding "on other contracts ... 'at the very end'" of the contract involved.

There was also other evidence supporting the Board's findings. At the time of the first work suspension, the project was 96.7 percent completed. The remaining work constituted less than $30,000 of the total contract price of $845,798. The relatively small amount of work remaining to be done further supports the Board's conclusion that Satellite could have taken on significant *replacement* work if it had been able to obtain it.

---

1. We agreed with the Board that Mech–Con should not have been compensated for the unabsorbed costs that accrued after April 23, 1986, for at that point the government allowed Mech–Con a three-month grace period to remobilize on the site. *See id.* At this point, as the Board correctly found, Mech–Con could no longer be considered on standby, and thus failed the first prong of the test. *See id.*

*Id.* at 1422 (emphasis added, internal citations omitted). We then concluded that Satellite's inability to obtain replacement contracts was due to the limitations on its security bond resulting from its failure to submit timely invoices and the difficult economic conditions of the time, which resulted in increased competition for the contracts available for bid, and therefore arose from problems that were "considerably of its own making" and was "not the result of the government's actions in suspending work." *Id.*

*Mech–Con, Altmayer,* and *Satellite Electric,* read together, suggest the government cannot rebut a *prima facie* showing of entitlement to recovery under *Eichleay* simply by showing that the contractor continued its normal operations, including continuing to bid on and perform "additional" contracts. We believe, in fact, that it would be inconsistent with the purpose behind *Eichleay* recovery to require a contractor to cease all normal, on-going operations during a government-caused suspension on one contract in order to guarantee its recovery of unabsorbed overhead costs. A healthy contractor may well be simultaneously engaged in multiple contracts, at different phases of performance. A government-imposed suspension during performance of one contract will not necessarily affect a contractor's ability to obtain and perform others. We also note that the Board's hypothetical, at page 19 of the slip opinion, further highlights the problem with adopting the government's position—it would be senseless to allow only the most and least successful contractors to recover indirect costs when the government suspends performance of a contract and requires the contractor to stand by during the suspension, while providing a majority of contractors with no avenue for relief. A requirement that a contractor show the impossibility of taking on *any* additional work solely because of the government's acts would run counter to public policy as well as industry practice. Thus, we conclude the government can rebut a contractor's prima facie case for entitlement to *Eichleay* formula damages by showing it was not impractical for the contractor to obtain other work.

We decline, therefore, to alter our test as urged by the government, and we refuse to require a showing of impossibility for recovery under *Eichleay.* Thus, to prevent recovery, the government must rebut a contractor's *prima facie* case by showing either (1) that it was not impractical for the contractor to obtain other work to which it could reallocate its indirect costs, or (2) that the contractor's inability to obtain other work was caused not by the government's suspension but by some other circumstance, as in *Satellite Electric.*

2. The Period in Which a Contractor's Overhead Expenses Resulting from a Government–Caused Suspension May Be Considered Unabsorbed

The government in its reply brief emphasizes All State's "ability" to bid on and perform new contracts during the period of the suspension as evidence that All State could have reallocated its indirect costs to such contracts. The government thus suggests that All State suffered no injury by reason of the suspension. This argument raises a separate question with respect to the second prong of the test: Must the government demonstrate that it was not impractical for the contractor to take on any *additional* work as a direct result of the government's suspension? Or, is the relevant consideration whether the contractor was unable to take on *replacement* work for purposes of reallocating its overhead costs? All State's cross-appeal also implicates this issue, albeit from a different perspective. All State contends that the Board erred in awarding *Eichleay* formula damages for only the twenty-two days by which the period of performance was extended as a result of the delay, rather than for the full fifty-eight day period of the suspension. All State argues that the government's concession that it caused a fifty-eight day delay during which All State was kept on standby requires the award of *Eichleay* damages for the entire suspension period.

■ To resolve this question, we must make a second clarification of the language we have used in our *Eichleay* formula case law. To great extent, we have referred to a contractor's "ability" or "inability" to obtain "additional" or "other" work in considering whether recovery under the *Eichleay* formula is warranted. As we have suggested

above, however, it would be pointless to require a contractor to cease all other normal business operations during a government suspension of one of its contracts simply to ensure it can recover indirect costs that are unabsorbed as a result of that suspension. In light of the discussion above, it is clear that the contractor's ability to take on, or continue to perform, other work in its normal course of business is irrelevant to the contractor's right to recover unabsorbed overhead expenses resulting from a suspension of performance on one of its contracts. Rather, a contractor is injured only when it cannot reallocate that portion of its indirect costs to an alternative or substitutional contract, and thereby those costs are unabsorbed. When a contractor is able to reallocate its indirect expenses to a contract it obtains beyond the work it performs in the ordinary course of business, however, it sustains no injury and therefore compensation under the *Eichleay* formula is not justified. This alternative or substitutional work we will hereafter call a "replacement" contract. Such a replacement contract might be a contract different in size or duration from a contractor's ordinary type of work (for example, a $100,000 contract by a contractor who normally obtains multi-million dollar contracts), or a contract for a different type of work (for example, a repair contract rather than new construction). The critical factor, then, is not whether the contractor was able to obtain or to continue work on other or additional projects but rather its ability to obtain a *replacement* contract to absorb the indirect costs that would otherwise be unabsorbed solely as a result of a government suspension on one contract.[2]

We must consider, therefore, what constitutes replacement work for purposes of recovery under the *Eichleay* formula. To do this, we must carefully examine the relationship between the standby test and recovery under the *Eichleay* formula. First, however, we must clarify explicitly whether overhead expenses become "unabsorbed" during the suspension period or the extension period and thus for which period the *Eichleay* formula was designed to compensate the contractor.

Although we have consistently required a showing under both prongs of the test for recovery under *Eichleay*, it is also clear that the uncertainty of the duration of the suspension which creates the contractor's standby status during that suspension is the critical factor which causes the injury. It is not, however, the length of the suspension itself that justifies recovery; rather, it is the resulting uncertainty as to the additional time that will be necessary to complete performance of the contract that causes the injury for which the *Eichleay* formula is designed to compensate the contractor.

▉ Our case law is quite clear that recovery under the *Eichleay* formula is an extraordinary remedy designed to compensate a contractor for unabsorbed overhead costs that accrue when contract completion requires more time than originally anticipated because of a government-caused delay. *See Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed.Cir.1993). Our case law is somewhat less clear as to which period of delay should be considered in awarding *Eichleay* damages—the suspension period (in this case, fifty-eight days), or the

---

**2.** In *Satellite Electric Co. v. Dalton*, 105 F.3d 1418 (Fed.Cir.1997), in response to the contractor's argument that the government had failed to rebut the contractor's *prima facie* case for *Eichleay* recovery because it failed to show that the "additional work [the contractor] sought was *intended* to replace the suspended work," *id.* at 1422 (emphasis added), this court stated:

> Finally, we reject [the contractor's] argument that the government had not rebutted Satellite's *prima facie* case because it had not shown that the additional work [the contractor] sought was intended to replace the suspended work. *The work [the contractor] sought during the time of suspension, if [the contractor] had*

*obtained it, necessarily would have replaced the suspended work.*

Id. at 1423 (final emphasis added). Although the highlighted sentence, at first glance, seems to support the government's argument in the instant case that any "additional" work is sufficient to prevent recovery under the *Eichleay* formula, in context it appears to respond to the contractor's attempt to incorporate an "intent" element into the government's rebuttal burden of proof. This aspect of the *Satellite Electric* opinion, therefore, does not contradict our conclusion in the instant case that *any* additional work is not automatically considered replacement work which would preclude recovery under the *Eichleay* formula.

extension period (in this case, twenty-two days). We believe the confusion as to which period creates compensable, unabsorbed overhead expenses—the suspension period or the extension period—exists in large part because of our vague, general references to the "delay period" in prior cases, as noted above.

After careful examination, it becomes clear that a contractor is only injured with respect to its indirect costs when the performance period of a contract is extended as a result of a government-caused suspension and not because of the suspension *per se*. Although we may not have explicitly decided this question, relevant case law does support this conclusion. For example, Judge Friedman, in a thoughtful concurring opinion, explained the purposes of recovery under *Eichleay* as follows:

> A contractor's estimate of its costs necessarily includes its overhead costs, which it calculates on the basis of the time required to perform the contract. Where performance of a contract has been delayed, the overhead expenses of performing that contract continue for the additional time. A portion of the total overhead for that additional period accordingly is allocable as a cost of performing that contract.

*Capital Elec. Co. v. United States*, 729 F.2d 743, 748 (Fed.Cir.1984) (Friedman, J., concurring); *cf. Altmayer v. Johnson*, 79 F.3d 1129, 1134 (Fed.Cir.1996) (noting that the government's "procrastination and nonresponsiveness made the length of the performance period extremely uncertain," and concluding that, as a result, the contractor "incurred three additional months of home office overhead expenses but no additional direct billings against which to charge them"). The Armed Forces Board of Contract Appeals in *Eichleay* concluded that compensation for indirect costs was justified

because it was "sufficiently demonstrated by the mere fact of *prolongation of the time of performance*, and the continuation of main office expenses, that more of such expenses were incurred during the period of performance than would have been except for the suspension." ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, 13,574–75 (1960) (emphasis added). Furthermore, it appears that the Court of Claims awarded unabsorbed overhead costs for the period by which contract performance was extended by the delay, not necessarily for the length of the delay. *See, e.g., B–W Constr. Co. v. United States*, 104 Ct.Cl. 608, 643–44, 1945 WL 4016 (1945) (determining "there was a total over-all delay in the completion of the contract, due to the fault of the defendant, of at least 60 days," and awarding overhead costs for that period); *Fred R. Comb Co. v. United States*, 103 Ct.Cl. 174, 183–84 (1945) ("[T]he contractor, instead of saving the salary of that proportion of his main office staff which is attributable to this contract, is obliged, in effect, to waste it, and to *spend a similar amount at the end of the contract for the extra time made necessary by the delay*." (emphasis added)).

We believe *Eichleay* recovery makes better sense if it is awarded for the period of time by which overall performance is extended, rather than the period of the suspension.[3] A contractor who generally can perform multiple contracts will not allocate all of its indirect costs to a single contract; rather, it will assign a proportional fraction of its total indirect costs for the contract period based both on the anticipated time of total performance of each particular contract, *see Capital Elec. Co.*, 729 F.2d at 748 (Friedman, J., concurring), as well as its other expected revenue streams during that period. The *Eichleay* formula, in fact, takes this into account by including "total billings for the

---

3. This court in *Satellite Electric Co. v. Dalton*, 105 F.3d 1418 (Fed.Cir.1997), suggested that *Eichleay* formula damages are calculated by multiplying the daily rate by "the number of days for which work was suspended." *See id.* at 1420. In fact, however, neither the Board nor this court reached the calculation issue because both agreed that the contractor was not entitled to any recovery under the *Eichleay* formula because its failure to obtain replacement work was not a direct result of the government-caused suspen-

sion of performance. *See id.* at 1420, 1422. Furthermore, the same opinion later correctly quoted the *Eichleay* formula, which calculates recovery by multiplying the daily rate by the "number of days of delay," *see id.* (quoting *Eichleay Corp.*, ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, 13,574 (1960)). The use of the word "delay" in that case thus further highlights the type of confusion that has arisen in our *Eichleay* formula case law as a result of imprecise terminology.

contract period" in the calculation for recovery.[4] Thus, at the outset, a contractor who knows or can estimate accurately the total time necessary to perform a particular contract can allocate indirect costs accordingly. Where the government suspends work on a contract for an uncertain period in the midst of performance, the contractor's prediction about total duration may no longer be accurate. Once the contract performance period extends beyond the initial deadline, indirect costs continue to accrue but the contractor has neither allocated them to the newly-extended contract nor is able to begin a new contract to absorb the next portion of these continuing costs. It is thus the period of performance required of the contractor beyond the anticipated end-date for which the contractor does not receive its indirect costs, for by continuing work on the delayed contract, the contractor is unable to begin work on the next new contract to which it would have allocated indirect costs for the next period. The ordinary course of the contractor's business is thus interrupted by the suspension; where normally the contractor would begin the next contract, to which a new portion of its indirect costs would be attributable, it is forced to extend performance on the old, suspended contract, while additional indirect costs accrue with no additional revenue to support them.

On the other hand, where a government-caused suspension does not actually result in any extension of time for completion of the contract, i.e., the contract is completed on time as originally scheduled, the contractor suffers no injury. This is because, despite the delay, the contractor's original estimate of the time required to complete performance remains accurate and the next contract can begin as anticipated. For this reason, we have not allowed such a contractor to recover indirect costs under the *Eichleay* formula unless the contractor meets an additional burden of proof:

> Where a contractor is able to meet the original contract deadline or, as here, to finish early despite a government-caused delay, the originally bargained for time period for absorbing home office overhead through contract performance payments has not been extended. Therefore, in order to show that any portion of the overhead was unabsorbed, such a contractor must prove that the bargained for ratio of performance revenue to fixed · overhead costs during the stipulated performance period ... has been adversely affected by the delay. This can only be established if such a contractor shows *that from the outset of the contract* it: (1) intended to complete the contract early; (2) had the capability to do so; and (3) actually would have completed early, but for the government's actions.

*Interstate Gen.*, 12 F.3d at 1058–59 (emphasis added). Thus, we have concluded that the contractor's injury is compensable under *Eichleay* only if the overall performance period—according to either the original deadline, or the contractor's provable early completion deadline—must be extended as a result of the government-caused suspension during the original performance period.

It is a general rule in government contract law that a contractor who makes a mistake in judgment will not later be compensated for any loss resulting from that mistake. Thus, just as we will not approve reformation of a contract price where a contractor makes a mistake in judgment in calculating its bid, *see Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed.Cir.1987), so too will we presume that a contractor is competent to allocate a fair proportion of its overhead costs to each contract it, wins. We cannot presume, however, that a contractor could anticipate with any certainty the length of time by which performance on the contract will be extended as a result of an unanticipated suspension of uncertain duration caused by the government. The net result, in these circumstances, is that the contractor

---

4. The *Eichleay* formula is as follows:
   1. Contract billings / Total billings for contract period × Total overhead for contract period = overhead allocable to the contract.
   2. Allocable overhead / Days of performance = Daily contract overhead

3. Daily contract overhead × No. days delay = Amount claimed.
*Eichleay Corp.*, ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, 13,568 (1960).

will unavoidably have underestimated the appropriate share of indirect costs to attribute to the performance of the contract; that underestimation is due to the government-caused delay during performance, not to any fault of the contractor's. Similarly, where the contractor in allocating its indirect expenses intended to complete performance of a contract early, it suffers the same injury when that performance period is extended as a result of the suspension, so long as the contractor can demonstrate that it did in fact plan an earlier completion date and had the ability to meet it. Where the total time to complete a contract is not affected by a suspension, however, the contractor's normal course of business is also not impacted by the suspension.

### C. The Relationship between Impracticality and Standby

We have recognized that "the linchpin to entitlement under *Eichleay* is the *uncertainty of contract duration* occasioned by government delay or disruption." *Altmayer v. Johnson*, 79 F.3d 1129, 1133 (Fed.Cir.1996) (emphasis added); *see also C.B.C. Enters. v. United States*, 978 F.2d 669, 675 (Fed.Cir. 1992) ("The raison d'etre of *Eichleay* requires at least some element of uncertainty arising from suspension, disruption or delay of contract performance."). If the contractor cannot predict the duration of the suspension, it also cannot predict the similarly uncertain extension of the time necessary to perform the contract beyond the original anticipated date of completion and thus the date on which it will be able to begin the next contract. While its resources are standing by, the contractor can neither reallocate those resources to accelerate another contract nor can it know when those resources will be available to begin work on the next contract. *Cf. Fred R. Comb Co.*, 103 Ct.Cl. at 184 (noting that, where the government delays performance on a contract, the contractor "is obliged, in effect, to waste [the proportionate amount of main office staff salaries that were attributable to the contract], and to *spend a similar amount at the end of the contract for the extra time made necessary by the delay*" (emphasis added)). On the other hand, where the government suspends work on a contract for a predeter-

mined, definite period, the contractor is not on standby during the suspension. As a result, the contractor is free to shift its resources to other contracts, accelerating performance of those projects to compensate for the future delay from the suspended contract. This ability to shift resources translates as well into an ability to reallocate indirect expenses such that no overhead costs go unabsorbed.

■ Our recognition of the importance of the standby factor in *Mech–Con Corp. v. West*, 61 F.3d 883 (Fed.Cir.1995), led us to shift the burden of production with respect to the second factor. *See id.* at 886 (explaining that proof of standby status was sufficient for a *prima facie* showing of entitlement under *Eichleay* in recognition of "the impracticality of a contractor obtaining replacement work ... when it must 'standby' during an 'uncertain' period of government-imposed delay"). Because we believe the uncertainty of the duration of the suspension and the necessity of remaining on standby throughout that suspension creates uncertainty with respect to the completion date of the contract and the start-up date for the next, and thus generally precludes the contractor from obtaining replacement work for its crew during that period, we re-affirm this shifted burden.

We note that in very few cases where the contractor can demonstrate it was on standby during the suspension will the government be able to demonstrate that it was not impractical for the contractor to take on replacement work. This does not persuade us, however, that either the test or the burden should be altered. First, the government has the ability to control whether a contractor is on standby status during a suspension of work. By fixing, at the outset of the suspension period, a future date on which the contractor will be expected to return to work, or by allowing the contractor a "remobilization" period at the end of the suspension period, *see id.* at 887, the government avoids keeping the contractor on standby during the suspension and thus avoids liability for unabsorbed overhead expenses in the future. Alternatively, as we suggested above, there may well be a number of circumstances in which the government will be able to demon-

strate that the contractor was not injured by reason of the delay even where the government cannot show that, the contractor could have obtained replacement work. For example, difficult economic conditions that exist independent of the government's actions with respect to a delay in performance may prevent a contractor from obtaining replacement work, although this circumstance is in no way attributable to the government's delay. *See Satellite Elec. Co. v. Dalton,* 105 F.3d 1418, 1422 (Fed.Cir.1997). Similarly, if the contractor was adequately able to reduce home office staff during the period of delay, no recovery would be allowed as no injury would have resulted from the delay. *See Daly Constr., Inc. v. Garrett,* 5 F.3d 520, 522 (Fed. Cir.1993).

### D. The Clarified Legal Test for Recovery under the Eichleay Formula

█ Thus, we conclude that indirect costs are only unabsorbed, and thus only compensable, to the extent they accrue during the extension period because a contractor must continue work on that contract to make up for standing by throughout an unexpected suspension caused by the government. We decline the government's invitation to modify the showing a contractor must make in order to recover its indirect costs after a government-caused delay. We reiterate that a government contractor can make a *prima facie* case for recovery of indirect costs under the *Eichleay* formula by showing that it was required to stand by during a suspension of work caused by the government, and that the duration of the suspension—and consequently, the additional time necessary to complete performance—was uncertain. We hold that the burden then falls on the government to demonstrate that it was not *impractical* for the contractor to take on *replacement* work and thus avoid the loss. To the extent our cases may have suggested that it is only the ability of the contractor to obtain replacement work *during* the actual suspension period that determines compensability, we clarify that it is the delay at the end of performance resulting from that suspension that results in unabsorbed overhead expenses which a contractor may recover under *Eichleay*. Thus, the relevant time frame for replacement work analysis begins

at the start of the suspension period and continues to the end of the extension period.

### IV. All State's Recovery Under the Eichleay Formula

█ In the instant case, neither All State's standby status during the suspension period nor the twenty-two day extension of performance is disputed. The only issue, then, is whether the government met its burden of proof under *Mech–Con* by demonstrating that it was not impractical for All State to take on replacement work, that All State's inability to take on replacement work was not caused by the government suspension, or that All State was not injured by the delay because it took some other action to mitigate the amount of overhead costs that otherwise would have remained unabsorbed by reason of the government's suspension.

We note that the Board did not discuss the government's burden although it found it was impractical for All State to take on replacement work. The government, however, was certainly aware of its burden; although it cites *Mech–Con* throughout its brief, it makes no mention of the evidence or argument it relies on to meet its burden of production. The Board found that All State had "bid several jobs smaller than those for which it would typically compete during the suspension period in an effort to generate revenue," *All State,* slip op. at 7, although All State's Comptroller testified that it generally bid on and performed "larger boiler renovation and mechanical projects, in the range, generally, of a hundred thousand to three or four million." Thus, for example, the government here could have argued that this smaller contract was not a part of All State's regular business activities to support its assertion that this contract was really replacement work to which All State could have allocated any otherwise unabsorbed overhead resulting from the twenty-two day extension of performance on the boiler work. Alternatively, the government could have attempted to indicate how All State's position at the time of the suspension was similar to that of the contractor in *Satellite Electric,* such that All State's inability to obtain replacement work could not be attributable to the government's suspension of performance on the

boiler contract. The government failed to make these arguments or present supporting evidence on these issues. Instead, the government simply suggested that All State's continued operations on other contracts during the delay demonstrated it was not impractical for All State to take on replacement work. This assertion alone, however, is insufficient to support its burden of proof required by *Mech–Con*.

Analyzed in this light, it is clear that the government failed to rebut All State's *prima facie* case. We therefore conclude that the Board's finding under the second prong— that it was impractical for All State to obtain replacement work as a result of the government's suspension of work—was supported by substantial evidence. We further conclude that the Board properly allowed All State to recover unabsorbed overhead expenses using the *Eichleay* formula.

With respect to the cross-appeal, All State argued to the Board that it had intended to complete the boiler repairs in 270 days, or 90 days ahead of schedule, and would have completed the contract early but for the government's delay. All State, however, failed to make the additional showing required under *Interstate General*, discussed above. The Board correctly determined that All State's early completion was dependent entirely on its use of temporary boilers during construction, the use of which was "the most significant reason the VA refused to approve [All State's] schedule." *All State*, slip op. at 11. The Board also found that All State failed to

provide any evidence supporting its claim that it could have completed the contract early even without using temporary boilers and that All State did not even attempt to adhere to its early construction schedule. *See id.* at 12. These findings were supported by substantial evidence. The government's concession that it suspended work on the boiler contract for fifty-eight days does not *ipso facto* justify All State's recovery of indirect costs for the entire period of the suspension. We therefore conclude that the Board properly determined that All State failed to meet its burden of proof under the applicable legal test and correctly awarded *Eichleay* damages to All State only for the twenty-two days by which the original deadline for performance was extended, and not for the full fifty-eight days of the suspension.

## CONCLUSION

Because the government on appeal has mischaracterized the required showings for recovery under the *Eichleay* formula, and because both the Board's finding that it was impractical for All State to obtain replacement work and its determination that All State did not sufficiently demonstrate it would have completed the contract ahead of schedule were supported by substantial evidence, we

*AFFIRM.*