**RYCO CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 01–151 C.

United States Court of Federal Claims.

Dec. 23, 2002.

Paul M. Mahoney, Claremont, CA, for plaintiff.

David B. Stinson, with whom were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, and Todd M. Hughes, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. James E. Andrews, Office of General Counsel, United States Department of Agriculture, San Francisco, CA, of counsel.

*OPINION*

HEWITT, Judge.

This matter comes before the court on Defendant's Motion for Summary Judgment (Def.'s Mot.). Plaintiff, Ryco Construction, Inc. (Ryco), is an engineering and construction company based in Gardena, California. Complaint (Compl.) at ¶ 5. In its complaint, plaintiff asserts a right to compensation for road repair work done in Los Padres National Forest, California under a contract with the United States Forest Service. *Id.* at ¶¶ 3–4. Plaintiff alleges that because of a delay caused by the government it incurred additional costs at Big Caliente, one of the twenty project sites covered by the contract. Plaintiff's Opposition to Motion for Summary Judgment (Pl.'s Opp.) at 3–6.

Defendant argues that it is entitled to summary judgment on many grounds. Defendant notes that plaintiff's argument is premised on having unrestricted access to the Big Caliente site. Defendant argues that the contract did not guarantee plaintiff unrestricted access to all the project sites and, for that reason, this case should be resolved in defendant's favor. Defendant's Motion for Summary Judgment (Def.'s Mot.) at 5. Defendant argues that bilateral contract modification number 3 was an accord and satisfaction, which precludes plaintiff from seeking further damages. *Id.* at 8–13. Defendant argues that plaintiff did not give the government adequate notice of its increased costs, and therefore is precluded from bringing suit now. *Id.* at 13–15. Because the delay resulted from the discovery of an endangered species at Big Caliente, defendant argues

that the cause of the delay was an act of government, and that plaintiff's contract does not entitle plaintiff to compensation for additional work performed as a result of acts of government. *Id.* at 16–17. Defendant argues that the terms of plaintiff's contract do not entitle plaintiff to compensation for the period during which the contract was suspended due to winter shutdowns. *Id.* at 17–19. With regard to damages, defendant argues that plaintiff is precluded from recovery because it failed to support its claim with actual cost data, *id.* at 19–25, and that, even if the delay was caused solely by the government, plaintiff is not entitled to payment of extended home office overhead. *Id.* at 25–28.

Plaintiff argues against the legal merits of defendant's arguments, and asserts that there are genuine issues of material fact that must be resolved at trial. Pl.'s Opp. *passim.* Plaintiff argues that the contract by its express language gave it unrestricted access to all project sites. *Id.* at 9–13. Plaintiff argues that contract modification number 3 was not an accord and satisfaction because there was no meeting of the minds regarding the claims plaintiff was settling. *Id.* at 14. Plaintiff argues that it gave the government adequate notice of its increased costs and, even if it did not, there is no showing of prejudice to defendant. *Id.* at 21–26. Plaintiff further argues that it is entitled to compensation for both the winter shutdowns and the delay caused by the act of government. *Id.* at 27–30. As to damages, plaintiff contends that it has supported its claims with actual cost data, and that it is entitled to extended home office overhead. *Id.* at 30–38.

For the following reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part.

I. Background

On August 26, 1996, Ryco Construction Co. was awarded a contract with the Forest Service to perform storm damage repairs at 20 different sites on and adjacent to roads located in the Los Padres National Forest (National Forest). Defendant's Proposed Findings of Uncontroverted Facts (DPFUF) ¶ 1.[1]

Many of the project sites were in remote areas of the National Forest, scattered over a total area of several hundred square miles. *Id.* ¶ 4. The scope involved "the repair of storm damaged roads, which consist of earthwork, construction staking, sampling & testing, reinforced concrete crib walls, galvanized berm drains, corrugated metal pipe, rolling drainage dips, reinforced concrete low water crossings, riprap bank armoring, and grout riprap spillways." *Id.* ¶ 7. After modifications, the total contract price was $629,532.32. *Id.* ¶ 6.

Big Caliente was one of the riparian project sites to which a project season limitation applied, and is at the center of this dispute. DPFUF ¶ 17. The contract drawings for this site included the statement that the construction season was limited to "when stream is dry to winter rains or as approved by COR [Contracting Officer's Representative]." *Id.;* Joint Appendix of Supplemental Documents (J.A.) at 229. Generally, the construction season occurred when streams were dry: in the summer, fall, and early winter. *See* J.A. Exhibit (Exh.) 6. In its bid, Ryco anticipated subcontracting most of the work at Big Caliente; of the $108,970 bid for the work, Ryco's portion of the work was $40,370. DPFUF ¶ 27.

Problems began at Big Caliente when endangered frogs were found at the job site. J.A. at 269. On August 26, 1997, the government issued work order no. 4, which ordered plaintiff not to begin construction at the site during the then current construction season. *Id.;* DPFUF ¶ 37. The purpose of work order no. 4 was to allow the Forest Service to consult with the Fish and Wildlife Service and obtain a biological report concerning the endangered species at the site. DPFUF ¶ 37. That report was issued on September 15, 1998. J.A. at 302; DPFUF ¶ 38. On October 7, 1998, the Forest Service issued a notice to resume work at the site. Plaintiff's Proposed Findings of Undisputed Fact (PPFUF) ¶ 29. One day later, plaintiff began to remobilize to complete work at Big Caliente. *Id.* ¶ 31.

---

1. The facts relied on in this opinion and cited to only one of the parties' Proposed Findings of

Uncontroverted Fact or other filings do not appear to be in dispute.

During the course of performance, the parties entered into four bilateral modifications. DPFUF ¶ 5. Of greatest importance to the facts of this case is modification 3, which increased the contract performance period by ten days and the contract price by $25,003.38. *Id.* Modification 3 did not contain a contract release or other similar language. J.A. Exh. 4. The stated justifications for modification 3 were that:

1. Contractor was prevented from beginning work on Big Caliente due to shutdown by FS [Forest Service] as the result of discovering endangered species on site requiring consultation with U.S. F & WS [U.S. Fish & Wildlife Service] which took approx[imately] 1½ years.

2. Demolition of old crossing was erroneously left out of contract.

3. A design change was required to shift low spot of crossing over to center of channel, which required modifying spillway into a cutoff wall.

4. The increase in square footage of cribwall was required to meet grade.

*Id.* at 210.

Modification 3 was issued in response to a letter sent by plaintiff on October 12, 1998, advising the Forest Service that it had been delayed from performing contract work at Big Caliente due to the discovery of endangered species. PPFUF ¶ 32; Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ¶ 32. Plaintiff has conceded that the date of its notice forecloses recovery for any costs of the work relating to the period prior to October 12, 1998, but leaves open its effect on other damages. Pl.'s Opp. at 21–22 ("All of the increased costs to do the work [at Big Caliente] were incurred *after* October 12, 1998.") (emphasis in original); Transcript of Oral Argument held on September 30, 2002(Tr.) at 58 ("The increased costs for labor, materials and equipment were incurred [at Big Caliente] after October 12, 1998, whereas we are obviously claiming portions of EICHLEAY [sic] [damages] for the delay that occurred before.") Plaintiff also states that it did not incur increased construction costs for Big Caliente until after it gave notice of this delay. PPFUF ¶ 33.

Final acceptance for all work done under the contract occurred on October 27, 1999. DPFUF ¶ 61. Plaintiff submitted a revised Request for Payment for Unpaid Work Performed on March 7, 2001. PPFUF ¶ 66. On March 13, 2001, the contracting officer issued his decision denying plaintiff's claim. DPFUF ¶ 67.

## II. Discussion

### A. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Rules of the United States Court of Federal Claims (RCFC) 56(c). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y of Dept. of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505. Summary judgment is appropriate where the sole dispute concerns the interpretation of a government contract, a question of law. *See Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir.1996).

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton*

*Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The court reviews decisions by a contracting officer on a *de novo* basis. 41 U.S.C. § 609(a)(3) (1987); *Wilner v. United States,* 24 F.3d 1397, 1401 (Fed.Cir.1994) (citing 41 U.S.C. § 609(a)(3)).

### B. Access to the Construction Site

The first issue presented by defendant's motion is whether the contract guaranteed unrestricted access to the Big Caliente construction site. Def.'s Mot. at 5. This question must be resolved using a two-step process. First, the court interprets the contract to determine if the government could restrict plaintiff's access to the construction site. *See Precision Pine & Timber, Inc. v. United States,* 50 Fed. Cl. 35, 57–58 (2001). The court then decides whether that power to restrict was exercised reasonably. *Id.*

▉ The primary concern in contract interpretation is discerning the intent of the parties. *Samsung Electronics America, Inc. v. United States,* 106 F.3d 376, 379 (Fed.Cir. 1997). To discern the intent of the parties, the court must first look to the plain language of the contract. *Massie v. United States,* 166 F.3d 1184, 1189 (Fed.Cir.1999). If the plain meaning of terms in the contract is clear, then the court need not consider extrinsic evidence. *HRE, Inc. v. United States,* 142 F.3d 1274, 1276 (Fed.Cir.1998).

Defendant argues that the contract and accompanying documents placed restrictions on the plaintiff's access to the construction site. Def.'s Mot. at 5–8. Specifically, defendant argues that the construction season limitations contained in the contract drawings and FAR § 52.236–15, which was incorporated into the contract, preclude an argument that plaintiff has unrestricted access. *Id.* at 5–6.

The contract drawings state that the Big Caliente site has "[c]onstruction season limitations, when stream is dry to winter rains or as approved by the COR." J.A. at 229. The contracting officer was also given the right to approve the contractor's proposed schedule under FAR § 52.236–15. J.A. at 54–55; 48 C.F.R. § 52.236–15. According to defendant, these "restrictions were placed upon the contractor for work at riparian sites, with discretion being provided to the COR regarding access to these sites." Def.'s Mot. at 6.

▉ The court must first address whether the contract language cited by defendant is ambiguous. "Contract language is ambiguous if it is susceptible to two different interpretations, each of which is consistent with the language of the contract." *Metric Constructors, Inc. v. United States,* 44 Fed. Cl. 513, 520 (1999), *aff'd* 10 Fed.Appx. 853 (Fed.Cir.2001) (unpublished) (citing *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993)). Here, the language "when stream is dry to winter rains or as approved by the COR" contained in the contract drawings is ambiguous. The phrase "or as approved by the COR" could either expand the construction season (meaning the COR could approve work even when the stream was wet) or it could restrict the season (meaning the COR could refuse to approve work even when the stream was dry), or the phrase could mean both of the foregoing. Because these three interpretations are all consistent with the language of the contract, the contract language is ambiguous.

▉ When the court finds that contract language is ambiguous, it must then determine if that ambiguity is patent. *Metric,* 44 Fed.Cl. at 521. The court determines whether an ambiguity is patent on a case-by-case basis. *P.R. Burke Corp. v. United States,* 47 Fed.Cl. 340, 352 (2000), *aff'd* 277 F.3d 1346 (Fed.Cir.2002), (citing *Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1435 (Fed.Cir.1992)). Patent ambiguities are "so glaring as to raise a duty to inquire" by the contractor. *Metric,* 44 Fed.Cl. at 522 (quoting *United States v. Turner Constr. Co.,* 819 F.2d 283, 286 (Fed.Cir.1987)). The test to determine whether an ambiguity is patent is whether the ambiguity is obvious. *Metric,* 44 Fed.Cl. at 522 (citing *Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 455 F.2d 1037, 1044–45 (1972)).

Latent ambiguities are those ambiguities that are not obvious. *See Metric,* 44 Fed.Cl. at 522. Latent ambiguities are " 'hidden or concealed ... [and are] not apparent on the face of the document' and 'could not be discovered by reasonable or customary care.' " *Input/Output Technology, Inc. v. United States,* 44 Fed.Cl. 65, 72 n. 10 (1999) (quoting *Analytical & Research Tech. Inc. v. United States,* 39 Fed.Cl. 34, 46 (1997)). A latent ambiguity becomes evident when " 'considered in light of the objective circumstances, two conflicting interpretations appear reasonable.' " *Input/Output,* 44 Fed. Cl. at 72 n. 10 (quoting *Cray Research, Inc. v. United States,* 41 Fed.Cl. 427, 435 (1998)).

A patent ambiguity is construed against the contractor, while a latent ambiguity is construed against the government under the general rule of *contra proferentem. Metric,* 44 Fed.Cl. at 521, 522; *GPA–I, LP v. United States,* 46 Fed.Cl. 762, 769 (2000), *aff'd* 10 Fed.Appx. 804 (Fed.Cir.2001) (unpublished). Even in the case of a latent ambiguity, the contractor's interpretation must still be reasonable, *GPA–I, LP,* 46 Fed. Cl. at 769 (citing *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d at 1579), and the contractor must show that it "reasonably relied on its interpretation." *GPA–I, LP,* 46 Fed.Cl. at 769 (citing *Froeschle Sons. Inc. v. United States,* 891 F.2d 270, 272 (Fed.Cir.1989)).

Because this issue was not briefed by the parties and no findings of fact directly addressing this issue have been proposed, the court will require the parties to address this issue in further briefing or by additional dispositive motion. For the purposes of this opinion, the court now proceeds on the assumption that the contract language is properly read to support the government's view that it had discretion to restrict access to Big Caliente in periods outside the winter shutdown. As the court concludes below, however, even with the benefit of that favorable assumption, the government has not carried

its burden of proving that its access decisions were proper.

Plaintiff argues that the contract's explicit statement that "[t]he contractor shall begin performance within 15 calendar days and shall complete it within 168 days after receiving notice to proceed" constituted an affirmative representation on the part of the government that, in effect, guaranteed access. Pl.'s Opp. at 9; J.A. at 7.

Defendant argues that plaintiff's position is similar to and therefore foreclosed by the holding of *United States v. Howard P. Foley Co.,* 329 U.S. 64, 107 Ct.Cl. 710, 67 S.Ct. 154, 91 L.Ed. 44 (1946). Def.'s Mot. at 6–7. In *Foley,* a contract was entered into to install a field lighting system at National Airport. *Id.* at 65, 67 S.Ct. 154. The airport was being built up from the waters of the Potomac River through a process of hydraulic dredging. *Id.* at 66, 67 S.Ct. 154. As the dredging and paving work was completed, the contractor was to move in and install the lighting fixtures. *Id.* The dredging took longer than anticipated, however, resulting in a 157–day delay in completing the contract. *Id.*

The Court in *Foley* held that "the Government cannot be held liable unless the contract can be interpreted to imply an unqualified warranty to make the runways promptly available." *Id.* at 67, 67 S.Ct. 154. Not finding such express language in the contract, the Court found for the government. *Id.* at 67, 69, 67 S.Ct. 154. Plaintiff distinguishes *Foley* by arguing, *inter alia,* that there the government was not at fault for the delays, whereas here it was. Pl.'s Opp. at 11.

The court agrees with defendant that plaintiff's argument that the contract's timeline constitutes an affirmative representation guaranteeing unrestricted access to the construction site is misplaced. The contract at issue in *Foley* had a similar timeline as to when the contract would be completed, and the Court there did not find this created a promise on the part of the government. *Foley,* 329 U.S. at 65, 67 S.Ct. 154.[2] Even

---

2. "Respondent promised to complete the job within 120 days after notice to proceed. In fact the job was not finished until 277 days after the notice was given .... The 157 days delay resulted from the consequently long and irregular intervals between the times when these [runway] segments were made available to respondent to do its job. But for these delays, respondent apparently could have finished its work in 120 days." *Foley,* 329 U.S. at 65–66, 67 S.Ct. 154.

though the contract was not completed for 277 days because the government was not able to make the sites available to the contractor (through no fault of either party), the Court found that the government was not liable for any damages. *Id.* at 65–66, 67 S.Ct. 154. The court perceives no basis for distinguishing the language in this contract, and plaintiff has suggested no authority for making such a distinction. Therefore, the court finds no express warranty in plaintiff's contract guaranteeing access to effect completion within 168 days.

Because there is no specific warranty and assuming the relevant contract language can be interpreted to afford discretion to the government to restrict access, the court now considers whether any access restriction to which the government may be entitled was reasonably applied. The reasonableness of a restriction is intertwined with the government's implied duties to cooperate and not to hinder performance. *See Precision Pine,* 50 Fed.Cl. at 58–59.[3] This court has recently stated that "there is no dispute that the implied duty to cooperate and the implied duty not to hinder performance of contracts … are present in all government contracts." *Id.* The implied duties to cooperate and not to hinder performance of contracts are two separate, but related, duties. *Id.* at n. 31 (citing *Walter Dawgie Ski Corp. v. United States,* 30 Fed. Cl. 115, 130 (1993)). When the government actively interferes with the contractor, and that interference is not justified, then the government has breached its implied duty not to hinder or interfere with the contractor's performance. John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 297 (3d ed.1995). When some government action is essential for the contractor to perform and the government wrongfully fails or refuses to take that action, then the government has breached its implied duty to cooperate. *Id.* Because the duties to cooperate and not to hinder are

present in all government contracts, they qualify any right to suspend that the government has in this contract. *See id.*

The standard for whether the government has breached its implied duty to cooperate and not to hinder is found in *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539 (1984). If the contract contains a specific warranty, then breach of that warranty is a breach of the implied duty to cooperate. *Id.* at 549 (citing *Foley,* 329 U.S. at 67, 67 S.Ct. 154). Even without a specific warranty, an unreasonable delay on the part of the government can cause a breach of the implied duty not to hinder the performance of the contract. *Cedar Lumber,* 5 Cl.Ct. at 549. To recover for a breach of the implied duty to cooperate, a plaintiff must show fault on the part of the government and that the delay caused material damage. *Id.* at 550. In the absence of evidence from the government excusing or justifying the delay, the court will presume fault. *Id.*

Plaintiff argues that both elements of the *Cedar Lumber* test are met. Pl.'s Opp. at 13. This is because the government "knew there was an endangered species of frogs before it put the contract out to bid." *Id.* at 10. Plaintiff argues that this information was not made available to bidders, that the failure to disclose was unreasonable, and that the subsequent delay due to the study of endangered species was the fault of the government. *Id.* at 10–11, 13. In addition, this two-year delay followed what plaintiff claims is a late issuance of the notice to proceed. *Id.* at 9–10. Plaintiff argues that the notice to proceed would normally be given within one month of contract award, or August, 1996. *Id.* at 2. The notice to proceed was not issued here until October 2, 1996, one and one-half months later. *Id.;* J.A. at 258. Finally, the two-year delay of the contract is "clearly sufficient and substantial." *Id.* at 13.

---

**3.** The court notes that *Precision Pine,* as well *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539 (1984), discussed below, involve timber contracts, which can often be archaic and do not always follow the Federal Acquisition Regulations (FAR). *See Precision Pine,* 50 Fed.Cl. at

38–40; *Cedar Lumber,* 5 Cl.Ct. at 541. However, because these cases are used to analyze the implied duties to cooperate and not to hinder found in all government contracts, *see* Cibinic & Nash *supra,* the court finds it appropriate to utilize these authorities in analyzing the facts before it.

Defendant counters that the government's conduct here was reasonable. Defendant's Reply Brief (Def.'s Reply) at 2. Although the government did know of the existence of endangered frogs in the area of Big Caliente before the contract was put out to bid, it claims that it was unclear as to whether these frogs were actually present at the time the contract was bid and that the contracting officer for plaintiff's contract was not aware of the existence of the frogs. *Id.* Further, defendant argues that plaintiff was required to make an inspection of the site and never did so. *Id.* The contract's site inspection clause states that contractor's failure to inspect the site "will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government." *Id.* at 2–3; DPFUF ¶ 8.[4] Finally, defendant argues that any delay could not be found to have caused material damage because the clauses in the contract that give the contracting officer discretion over access to the site put the plaintiff on notice that a delay could occur in the course of performance. Def.'s Reply at 3. This latter argument misses the mark because the inquiry here is not into the government's right to limit access, but rather the propriety of its exercise of any right it may have had (to be determined in subsequent proceedings examining the application of the doctrine of latent and patent ambiguity to this case).

■■■■ Because plaintiff is alleging that defendant had superior knowledge regarding the presence of the endangered frogs, the court looks to the law on superior knowledge to analyze this dispute. To prevail on a claim of superior knowledge, a plaintiff must prove that it:

(1) ... under[took] to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain

such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Hercules, Inc. v. United States,* 24 F.3d 188, 196 (Fed.Cir.1994) (quoting *American Ship Bldg. Co. v. United States,* 228 Ct.Cl. 220, 654 F.2d 75, 79 (1981)). Further, "a critical element in the [superior knowledge] doctrine is that there must be a factual showing the government knew bidders were not in possession of the vital information and would not be able to learn about it before bidding." *PCL Constr. Servs., Inc. v. United States,* 47 Fed.Cl. 745, 793 (2000).

■■■■ To support its contention that defendant knew about the frogs, plaintiff points to a biological evaluation prepared in 1995 and revised in 1998. Plaintiff's Appendix to its Opposition to Defendant's Motion for Summary Judgment (Pl.'s App.) at 45. That report noted the presence at Big Caliente of endangered red-legged frogs and Arroyo toads, both of which could be impacted by the construction project. *Id.* at 49–51. Plaintiff has been unable to point to any deposition or other document that shows that the contracting officer for plaintiff's contract knew about the report. At oral argument, plaintiff could only rely upon "the actual report itself, ... and the inferences that flow from one aspect of government having knowledge that we're claiming is imputed to the government in this case." Tr. at 34.

Plaintiff is entitled to "receive the benefit of all applicable presumptions, inferences, and intendments" when the court decides defendant's motion for summary judgment. *Allen Orchards,* 749 F.2d at 1574. Here, it is possible to draw the inference that if one component of the government concerned with activities in a National Forest knew about the endangered frogs at Big Caliente, another component charged with management of that same National Forest might know as well. The court finds that inference suffi-

---

4. While the site inspection clause may have applied had this dispute been about soil conditions or the quality of access to a remote site, the court does not believe that plaintiff could be expected not only to see frogs in a stream near the con-

struction site, but also to know that certain of those frogs were an endangered species whose presence could lead to a lengthy delay in the completion of the project.

cient to create a genuine issue of material fact concerning plaintiff's claim of superior knowledge and therefore to defeat defendant's motion for summary judgment on the propriety of defendant's exercise of access restrictions under the contract.

Once the contracting activity became aware of the endangered frogs, it was within its authority to suspend performance at Big Caliente pending consultation with the Fish and Wildlife Service. *See Croman Corp. v. United States*, 44 Fed.Cl. 796, 807 (1999). Therefore, defendant did not act unreasonably when it suspended performance at Big Caliente. If defendant knew of the endangered frogs in 1996, however, it may have acted unreasonably in delaying issuance of the notice to proceed. *See Parish v. United States*, 120 Ct.Cl. 100, 98 F.Supp. 347, 349 (1951) (if notice to proceed is withheld for an unreasonable time, that act may be construed as breach of contract). At trial, the court will hear evidence as to whether the contracting authority knew about the endangered frogs prior to contract award and, if it did, whether it acted unreasonably by not notifying plaintiff of this potential problem at that time.

### C. Accord and Satisfaction

■ Accord and satisfaction is a means to discharge an existing right. *Safeco Credit and Fraley Assoc., Inc. v. United States*, 44 Fed.Cl. 406, 419 (1999) (citing *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 654 F.2d 711, 716 (1981)). "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 343 F.2d 951, 955 (1965). Defendant has the burden of showing that the elements of the accord and satisfaction were present to succeed on its summary judgment motion. *McLain Plumbing & Elec. Serv., Inc. v. United States*, 30 Fed.Cl. 70, 80 (1993) (citing *Brock & Blevins*, 343 F.2d at 955). "[I]f the defendant demonstrates an accord and satisfaction pertaining to the original ... contract, the plaintiff would lose the right to sue the Government for claims based upon the prior

contract on the grounds of discharge." *McLain Plumbing*, 30 Fed. Cl. at 80.

The dispute here centers on whether there was a meeting of the minds. Both parties rely on the chain events that preceded modification 3. *See* Def.'s Mot. at 8–13; Pl.'s Opp. at 13–21. On October 12, 1998, five days after the suspension of work was lifted, plaintiff raised the issue of seeking additional funds for damages caused by the suspension. J.A. at 325. Plaintiff alleged that the suspension had resulted in changed conditions, and that "[t]hese changed conditions are causing current cost increases for which we will submit our cost increase claims and delay compensation claims as soon as possible." *Id.* at 325. On October 15, 1998, plaintiff submitted a claim for cost increases incurred by its subcontractor, *id.* at 213, and on November 16, 1998, plaintiff submitted its own claim. *Id.* at 214. The government then issued modification 3 pursuant to the contract's changes clause. *Id.* at 208.

The justification statement for modification 3 stated, "Contractor was prevented from beginning work on Big Caliente due to shutdown by [Forest Service] as the result of discovering endangered species on site requiring consultation with [United States Fish and Wildlife Service] which took approx 1½ years." Def.'s Mot. at 10; J.A. at 210. Modification 3 did not contain any reservation of rights as to further claims for delay damages. Def.'s Mot. at 10.

Defendant argues that these facts show that modification 3 was an accord and satisfaction of the plaintiff's claims for delay damages incurred at Big Caliente. *Id.* at 11. Defendant asserts that a bilateral contract modification that contains no reservation is an accord and satisfaction. *Id.* at 10 (citing *C & H Commercial Contractors, Inc. v. United States*, 35 Fed.Cl. 246, 252 (1996)). Because there is a valid accord and satisfaction, defendant argues, any claims addressed by modification 3 are barred. *Id.* at 11.

Plaintiff counters that both the express terms of modification 3 and the course of negotiations leading to its execution show that this was not an accord and satisfaction. Pl.'s Opp. at 18. Plaintiff points out that modification 3 contains no release language

of any kind, unlike the majority of the contracts in *C & H Commercial Contractors,* on which the government relies in its motion. *Id.* at 18–19. In addition, the language of the modification does not address or refer to delay damages or plaintiff's increased cost to complete work at Big Caliente. *Id.* at 18. Therefore, plaintiff argues, the express language of the modification does not support a conclusion that it constituted an accord and satisfaction. *Id.*

▮ The intent of the parties controls in determining if there was a meeting of the minds. *Safeco,* 44 Fed.Cl. at 419 (citing *McLain Plumbing,* 30 Fed.Cl. at 81). The contract modification itself is the best source of evidence regarding intent. *McLain Plumbing,* 30 Fed.Cl. at 81. A release is not an absolute prerequisite to finding that a bilateral modification constituted an accord. *Appeal of Edward H. Foran,* 2001 WL 210656, 2001 ASBCA Lexis 37 at *35, 2001–1 B.C.A. (CCH) ¶ 31,323 (Feb. 27, 2001). But "a release connotes immediacy, finality and an intent to substitute new obligations in place of those originally set forth in the contract. Absent a release, the modification is to be strictly construed." *Id.* Plaintiff must be able to show something beyond "subjective intent" to overcome a summary judgment motion, however. *Zueblin v. United States,* 44 Fed.Cl. 228, 233 (1999).

Both parties appear to concede, and the court agrees, that the language of modification 3 is not dispositive of the existence of accord and satisfaction. Both parties use documentation outside of modification 3 to argue their points regarding accord and satisfaction. *See* Def.'s Reply at 5 (discussing course of negotiations leading up to modification 3) and Pl.'s Opp. at 14 (arguing that the conduct, negotiations, and writings of the parties establish that there was never any meeting of the minds). The court notes that some board decisions have declined to find accord and satisfaction on the basis of language in a modification similar to that before the court here. *See, e.g., Appeal of Jara Realty Trust,* 2001 WL 246880, 2001 PSBCA

Lexis 5 at *9, 2001–1 B.C.A. (CCH) ¶ 31,347. Therefore, the court looks beyond the modification to determine if there was a meeting of the minds regarding modification 3.

Plaintiff argues that the course of negotiations for modification 3 shows that the modification was limited to mobilization costs, the subcontractor's increased prices, demolition of the old crossway, and design changes for the spillway, the only items explicitly referred to in the modification. Pl.'s Opp. at 20. Plaintiff contends, "At no time during all of the negotiations and conversations between plaintiff and the COR leading up to Modification No. 3 did they ever have any discussions that this modification would embrace plaintiff's additional costs to do the work at Big Caliente, or plaintiff's delay damages, or any other damages except what was expressly listed in the modification itself." *Id.* at 18.

▮ The parol evidence rule prevents the court from considering evidence outside the four corners of the document when put forth for the purpose of changing the meaning of clear, unambiguous language in that document. *King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. 231, 234 (1989). Extrinsic evidence is allowed "to determine the completeness of the contract in issue," however. *Design and Prod., Inc. v. United States,* 18 Cl.Ct. 168, 195 (1989).

▮ Here, extrinsic evidence can be used to determine if modification 3 constituted the entire agreement of the parties. Among the most important pieces of extrinsic evidence that plaintiff cites to is the declaration of Patrick Ryan, filed with the court on July 29, 2002. Defendant has moved to strike this declaration because it contains expert testimony, legal conclusions, and because Mr. Ryan lacks personal knowledge of certain facts set forth in the declaration. Defendant's Motion to Strike Declarations of Dan Peterson and Patrick Ryan (Def.'s Strike Mot.) at 11.[5]

After reviewing Mr. Ryan's declaration and deposition testimony, the court finds that

---

5. Because the court did not find the declaration of Dan Peterson helpful to resolving defendant's motion for summary judgment and therefore did not rely on it, the court believes this aspect of the motion is moot.

the declaration as a whole cannot be stricken.[6] Further, the declaration creates a question of material fact as to whether there was a meeting of the minds regarding modification 3. In that declaration, Mr. Ryan states his understanding that the only items covered by the modification were "(1) mobilization costs; (2) J & P's [the subcontractor's] increased prices; (3) demolition of the old crossway; and (4) the design change for the spillway." Declaration of Patrick Ryan (Ryan Decl.) ¶ 56. Mr. Ryan further states that he made this understanding known to the contracting authority by "[making] it very clear in my discussions and negotiations with the COR that the only issues that would be covered by the modification would be the four issues expressly set forth in the modification itself, which were (1) mobilization costs; (2) J & P's increased prices; (3) demolition of the old crossway; and (4) the design change for the spillway." *Id.*

In addition, evidence in the record shows that the costs claimed for mobilization leading up to modification 3 are not inconsistent with plaintiff's current position that modification 3 does not cover all of the costs of increased work done at Big Caliente. Attached to modification 3 are several letters between plaintiff, defendant, and the subcontractor involved in the Big Caliente project. J.A. at 211–17. These letters show how the increased mobilization costs were calculated for inclusion in modification 3. *Id.* These letters also support the inference that modification 3 was limited to mobilization costs and did not include any delay damages and overhead costs that plaintiff may be entitled to. Viewing Mr. Ryan's statements and other evidence in the record in the light most favorable to plaintiff, the court finds that there are genuine issues of material fact in dispute as to the intent of the parties and cannot find that there was a meeting of the minds as a matter of law.

6. In its motion to strike the declaration of Patrick Ryan (Ryan Decl.), defendant argues that the declaration contains expert testimony even though Mr. Ryan has not been identified as an expert, that it contains several legal conclusions, and that Mr. Ryan lacks personal knowledge of certain facts set forth in this declaration. Def.'s Strike Mot. at 11. Plaintiff counters:

> The declaration of Ryan is based on his personal knowledge because he was a percipient witness to the underlying transactions. His testimony would be admissible and would not be subject to objection if he were testifying in court. He is competent to testify because he has been engaged in the construction business for over 35 years, and was personally involved on behalf of plaintiff on this project.

Plaintiff's Opposition to Motion to Strike Declarations of Dan Peterson and Patrick Ryan (Pl.'s Strike Opp.) at 1.

Defendant claims that Mr. Ryan did not have personal knowledge of a conversation detailing when endangered frogs were found at the Big Caliente work site and the resulting oral order to stop work. Def.'s Strike Mot. at 13. The court has not used Mr. Ryan's declaration to determine whether that work stoppage was reasonable, and it is therefore moot whether Mr. Ryan had personal knowledge of that chain of events. Defendant does not challenge Mr. Ryan's personal knowledge of the events surrounding the execution of modification 3. Because the court is using Mr. Ryan's declaration for the sole purpose of determining whether modification 3 was an accord and satisfaction, defendant's personal knowledge argument is moot.

Because the court is using Mr. Ryan's declaration to determine whether modification 3 was an accord and satisfaction, it must address whether Mr. Ryan is offering expert testimony without being identified as an expert, and whether he is presenting legal opinions to the court. Defendant specifically argues that the use of terms of art such as "meeting of the minds," Ryan Decl. ¶¶ 58, 59, and "accord and satisfaction," Ryan Decl. ¶ 60, are beyond the scope of permissible lay opinion, and therefore the declaration must be stricken. *See* Def.'s Strike Mot. at 11–13.

The court agrees that the legal conclusions contained in Mr. Ryan's declaration would not be admissible, at least for their truth, as part of the testimony of a lay witness, and the court does not rely on those conclusions in this opinion. Therefore, the objectionable language cited by the defendant is stricken. But the court does not agree with defendant that the declaration as a whole should be stricken. Mr. Ryan was a percipient witness to the negotiations leading up to modification 3. His declaration contains many statements regarding what he discussed with the COR, Ryan Decl. ¶¶ 48–51, what his belief was regarding the scope of modification 3, *id.* ¶¶ 53–54, and his attempts to communicate that belief to the COR, *id.* ¶ 56. All of these statements are factual matters helpful to the court in determining whether modification 3 was an accord and satisfaction as a matter of law, and all are based on Mr. Ryan's personal knowledge. Therefore, the court GRANTS defendant's motion to strike as to the truth of the legal conclusions identified on page 12 of defendant's motion, but DENIES the motion as to factual matters relating to Mr. Ryan's personal knowledge of events surrounding the execution of modification 3.

### D. Failure to give the government notice

The parties' contract included FAR § 52.243-4, the changes clause. J.A. at 98; FAR § 52.243-4 (Aug.1987). This clause governs the procedure by which changes are made to the contract, and what notice is required to be given concerning changes. *Id.* Subparagraph (b) of the clause requires the contractor to notify the contracting officer of any written or oral order that constitutes a change to the terms of the contract. *Id.* Subparagraph (e) requires the contractor to assert its right to an adjustment in contract price within 30 days of receipt of a written change order or, in the case of a constructive change, within 30 days of the contractor's giving notice of the change to the contracting officer. *Id.* Subparagraph (d) of the clause precludes the recovery of costs incurred more than 20 days before the contractor provides the notice of the change required by subparagraph (b). *Id.*

Defendant argues that plaintiff did not comply with the terms of the changes clause. Def.'s Mot. at 14. Defendant's argument is based on plaintiff's failure to provide notice to the contracting officer prior to October 12, 1998, thereby foreclosing plaintiff from bringing its claim under subparagraphs (c) and (e) of the changes clause.[7] *Id.* at 15.

Plaintiff focuses instead of subparagraph (d) of the changes clause, which states that "no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the contractor gives written notice as required." Pl.'s Opp. at 22; J.A. at 98. Because all its additional construction costs were incurred after October 12, 1998, the date when plaintiff did provide written notice to the contracting officer, plaintiff contends that its costs are recoverable. Pl.'s Opp. at 22. Plaintiff argues that, because the contracting officer did not order the suspension in writing as required by subparagraph (a), plaintiff's letters in 1998 are sufficient to satisfy the requirements of the changes clause. *Id.* at 23.

Even if notice was untimely, plaintiff argues, the untimeliness did not prejudice the government. Pl.'s Opp. at 24. Plaintiff asserts that, because the government knew of the delay, provided a handwritten note that stated Ryco was entitled to an adjustment for the delay, and solicited an estimate from another contractor for the delayed work at Big Caliente, defendant cannot show prejudice in this case. *Id.* at 24–25.

Defendant argues that there is clear prejudice. Def.'s Reply at 9. Defendant focuses on the plaintiff's "fail[ure] to notify the Government of its additional half million dollar delay claim until just two months prior to contract completion." *Id.* at 11. Defendant argues that if plaintiff had provided notice earlier, the government could have assessed the various options available, including partial termination for convenience. *Id.* at 9. Finally, defendant asserts that plaintiff gave no indication at the time modification 3 was negotiated and entered into that it would have additional delay damages at a later date. *Id.* at 9–10.

The Federal Circuit has stated that delay in the assertion of a claim by a contractor causes some degree of prejudice to the government. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1392 (Fed.Cir. 1987). But the remedy for this prejudice is not, as defendant asserts, a denial of the plaintiff's claim. *See* Def.'s Mot. at 15. Instead, any prejudice serves to increase the plaintiff's burden of persuasion. *T. Brown Constructors, Inc. v. Sec'y of Transp.*, 132 F.3d 724, 733 (Fed.Cir.1997) (quoting *Mingus*, 812 F.2d at 1392) ("[T]he existence of prejudice resulting from the dilatory notice usually serves to increase the burden of persuasion facing the contractor asserting its claim for equitable adjustment rather than to bar its claim entirely."). Therefore, plaintiff must provide "substantial evidence" in order

---

7. Subparagraph (c) provides that "no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment." FAR § 52.243-4(c); J.A. at 98. Subparagraph (e) states that "[t]he Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause ...." FAR § 52.243-4(e); J.A. at 98.

to succeed in its claim. *T. Brown*, 132 F.3d at 733.[8]

### E. Act of Government

While the parties agree that there was a sovereign act of government in this case, there is disagreement about the import of that fact for their respective contract obligations. *See* Def.'s Mot. at 16–17; Pl.'s Opp. at 27–29. Defendant argues that plaintiff's claim is limited by FAR § 52.249–10 (Apr. 1984) and *Crowman Corp. v. United States*, 51 Fed.Cl. 654, 655–56 (2002); Def.'s Mot. at 16. FAR § 52.249–10 provides that, if a delay is caused by something "beyond the control and without the fault or negligence of the Contractor," such as an act of government, "the time for completing the work shall be extended." J.A. at 113–114.[9] This provision has been held in other circumstances to limit the relief afforded the contractor to a time extension, rather than to an equitable adjustment. Def.'s Mot. at 17 (citing *Vicari v. United States*, 47 Fed.Cl. 353, 358 (2000)).

Defendant further argues that this contract did not contain a suspension of work clause or "any provision discussing the respective rights of the parties in the event endangered species are encountered at the site." Def.'s Mot. at 16. According to defendant, this makes the case analogous with *Croman*, where the court found that the plaintiff was limited to an extension of time to complete the contract, unless it could show that the government's subsequent conduct was unreasonable or wrongful. *See id.* at 16–17; *Croman v. United States*, 49 Fed.Cl. 776, 784–85 (2001).

Plaintiff counters that this case is distinguishable from *Croman* because here the changes clause "expressly provides that the contracting officer shall make an equitable adjustment for any changes that cause an increase in the contractor's costs of work."[10] Pl.'s Opp. at 28–29. Plaintiff also points out that the court in *Croman* acknowledges that "[t]he Rice [*United States v. Rice*, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942)] doctrine [holding that when a contract clause reserved the government's right to make specific changes and gave the contractor a right to an extension of time should the government exercise that right, the contractor is not entitled to delay damages unless specifically provided for elsewhere in the contract, 317 U.S. at 65–66], 63 S.Ct. 120 is now rarely applied, since most government contracts expressly provide for equitable adjustments when conditions change." Pl.'s Opp. at 28 (citing *Croman*, 49 Fed.Cl. at 784).

While the *Christian* doctrine[11] could be available here to incorporate the suspension

---

8. The meaning of the term "substantial evidence" as a standard in this context has not been treated extensively in the cases. The parties are requested to address this point in their pretrial filings.

9. FAR § 52.249–10, as incorporated into the parties' contract, states in pertinent part:
 (b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if–
 (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include ... (ii) acts of Government in either its sovereign or contractual capacity ....
 (2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended ....

FAR § 52.249–10; J.A. at 113–14.

10. Plaintiff cites to the changes clause, FAR § 52.243–4, which is incorporated into the parties' contract and states:
 (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, ... the Contracting Officer shall make an equitable adjustment and modify the contract in writing
 ....

FAR § 52.243–4; J.A. at 98; *see* Pl.'s Opp. at 28.

11. "It is well-settled that applicable provisions of the FAR are incorporated into every federal government procurement contract and have the same effect as if they were set forth in the contract itself." *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed.Cl. 405, 407–408 (1992). Moreover, under the "Christian doctrine," set forth in *G.L. Christian and Assocs. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418 (1963), *reh'g denied*, 160 Ct.Cl. 58, 320 F.2d 345 (1963), *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d

of work clause into this contract, neither party believes that the suspension of work clause is applicable to the facts of this case. Tr. at 28–30, 41–42. The court must decide whether the default clause, FAR § 52.249–10, applies, as argued by defendant, Tr. at 27–28, or the changes clause, FAR § 52.243–4, governs, as argued by plaintiff. Tr. at 32; J.A. at 98.

■■■■■ The court agrees with defendant that, absent a provision under which the government assumes an obligation for such risk, the default clause limits the contractor to a time extension when a delay is caused by an "act of government," such as occurred here. *See Vicari,* 47 Fed.Cl. at 358. The court notes that boards have held that, even in these circumstances, the changes clause can be used to provide an equitable adjustment when the government violates its implied duty to cooperate, *see, e.g., Appeal of R.W. Jones Constr., Inc.,* 1999 WL 115108, 1999 IBCA Lexis 1 at *39, 99–1 B.C.A. (CCH) ¶ 30,268, and the court finds that authority persuasive on this point. In this case, the Forest Service has not established that it was without fault when it failed to alert bidders to the possible existence of endangered species at the Big Caliente site. That failure may be shown at trial to be without fault or it may be shown to violate a duty owed to the contractor. The court finds that, absent a showing of the breach of an implied duty, the limitations in the default clause exist to protect the sovereign when it acts in its sovereign, rather than its contracting, capacity. The court finds that the decision to suspend work due to the presence of endangered species is such a sovereign activity. *Croman,* 44 Fed.Cl. at 807. However, the government must exercise its rights without violating other duties owed to a contractor. *See Croman,* 49 Fed.Cl. at 785 (delay may be unreasonable). Therefore, summary judgment is not appropriate on this issue.

### F. Winter Shutdown

■■■■ Plaintiff argues that it is entitled to be compensated for delay damages incurred over the winter shutdowns of 1997 and 1998. Pl.'s Opp. at 29. Plaintiff's argument rests on the contention that the government caused both of these shutdowns. *Id.* According to plaintiff, it "was shutout by the Government from doing any more work in 1997 because there was no more work to do. It had absolutely nothing to do with winter." *Id.* But for the initial suspension, plaintiff asserts it would have finished the job in 1997 and would not have had to sit through winter shutdowns that year and in 1998. *Id.*

Defendant argues that plaintiff has already been compensated for any delay costs incurred due to the 1997 shutdown in contract modification number 3. Def.'s Reply at 14. Defendant argues that since plaintiff requested the 1998 winter shutdown, it cannot now seek delay damages arising from it. *Id.* at 15.

At oral argument, plaintiff conceded that it had requested both winter shutdowns at issue here. Tr. at 17. Because plaintiff requested these shutdowns, the court does not see how plaintiff can be compensated for any delay associated with them. As there is no dispute of fact regarding who requested the winter shutdowns, summary judgment for defendant is appropriate here.

### G. Total Cost Method of Computing Damages

■■■■ The preferred method for calculating an equitable adjustment is the actual cost method. *Doninger Metal Prods., Corp. v. United States,* 50 Fed.Cl. 110, 125 (2001). This method requires the contractor to provide the court with specific documentation of the added expenses caused by the government conduct. *Id.* Determining damages is not an exact science, however, and the courts have allowed contractors to use other meth-

314 (1963), the "court may insert a clause into a government contract by operation of law if that clause is required under the applicable federal administrative regulations." *Gen. Eng'g & Mach. Works v. O'Keefe,* 991 F.2d 775, 779 (Fed. Cir.1993). The *Christian* doctrine applies to mandatory contract clauses reflecting "a signifi-

cant or deeply ingrained strand of public procurement policy." *Gen. Eng'g & Mach. Works,* 991 F.2d at 779. The doctrine also applies "to incorporate less fundamental or significant mandatory procurement contract clauses if not written to benefit or protect the party seeking incorporation." *Id.* at 780.

ods of computing damages. *Id.* The plaintiff must still meet its burden of proving damages by "furnish[ing] the court with a reasonable basis for computation, even though the result is only approximate." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965).

■ One such alternative method of computing damages is the total cost method. *Doninger,* 50 Fed.Cl. at 125. The total cost method computes damages as "the difference between a contractor's actual costs and its original bid." *Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir. 1991).

Plaintiff argues that it used the actual cost method of computing its damages in this case. Pl.'s Opp. at 31. Plaintiff asserts that the total cost method is calculated "by taking the total cost for the *entire* job, and subtracting from that the bid amount." *Id.* at 30 (emphasis in original). Here, plaintiff segregated out its costs for the Big Caliente project, and subtracted from this the amount it bid for work on that site. *Id.* at 31; J.A. at 350.

Defendant argues that "[n]othwithstanding the new label placed by plaintiff upon its methodology, there can be no doubt that plaintiff's claim utilizes a total cost approach to measure its damages." Def.'s Reply at 15. Defendant argues that actual costs are typically used in a total cost claim to determine the contractor's total cost of performance, so it is immaterial that plaintiff used actual cost data here. *Id.* at 16. According to defendant, it "is incumbent upon plaintiff to demonstrate increases in the costs of labor, materials, and equipment rentals resulting from the delay period." *Id.*

The court agrees with defendant that plaintiff cannot convert a total cost claim into an actual cost claim simply by segregating out the costs of the work at one of the project sites. An actual cost claim is based on the submission of actual documentation of increased costs. Here, plaintiff has not made this submission. Instead, plaintiff took its claimed total costs for work at the Big Caliente site, and subtracted from that the bid amount related to the Big Caliente site. This is the total cost method of computing damages, whether it is used to compute damages for the entire contract or one subpart. As plaintiff has chosen to use the total cost method, it must show its entitlement to utilize this method of computing damages.

■ According to the Federal Circuit, the availability of the total cost method is limited:

A trial court must use the total cost method with caution and as a last resort. Under this method, bidding inaccuracies can unjustifiably reduce the contractor's estimated costs. Moreover, performance inefficiencies can inflate a contractor's costs. These inaccuracies and inefficiencies can thus skew accurate computation of damages.

*Servidone,* 931 F.2d at 861–62. Because of these inaccuracies, courts have required four indicia of reliability be shown before a contractor can recover under the total cost method. *Cavalier Clothes, Inc. v. United States,* 51 Fed.Cl. 399, 418 (2001). Those four indicia are: "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." *Id.* (citing *WRB Corp. v. United States,* 183 Ct. Cl. 409, 426, 1968 WL 9146 (1968)). If a plaintiff cannot prove all of the elements, or if a defendant can disprove at least one of them, a plaintiff cannot utilize the total cost method. *Id.* (citing *Youngdale & Sons Constr. Co. v. United States,* 27 Fed. Cl. 516, 541 (1993)).

■ Defendant argues that plaintiff has not proven these elements, and thus cannot utilize the total cost method. Defendant argues that "[p]laintiff's books and records were more than sufficient to assemble a claim based upon actual costs[,]" thus defeating the first element. Def.'s Reply at 17. Defendant also argues that plaintiff has not proven its bid was reasonable, defeating the second element. *Id.* According to defendant, plaintiff's attempts to show the reasonableness of its bid is "fatally flawed as it fails to take into consideration the bid amount of all

seven contractors, and examines only the lowest four." *Id.* Finally, defendant points out that plaintiff experienced cost overruns at another construction site, where there was no claim of government-caused delay. Def.'s Mot. at 22. According to defendant, these cost overruns establish the unreasonableness of plaintiff's costs, defeating the third element. *Id.*

Plaintiff argues that its bid was reasonable and that it was not responsible for added expenses. Pl.'s Opp. at 31–32. Plaintiff argues that its bid was reasonable because it was well within the range of the four lowest bids, was lower than the engineer's estimate, and Ryco had the opportunity to compare the amount of its second bid with other bid amounts that were submitted in the first bid. *Id.* Plaintiff further asserts that delays caused by it amounted to only two days, in comparison to the large number of days of delay caused by the government, so that the delays caused by the contractor were de minimis and need not be taken into account in determining damages. *Id.* at 34. Plaintiff's claim that it was not responsible for added expenses because its contribution to the delay was de minimis is clearly at odds with its concession that it twice sought winter shutdowns. Tr. at 17. In this circumstance, plaintiff cannot carry its burden that it was not responsible for the added expenses. *Cavalier Clothes*, 51 Fed. Cl. at 418.

Nor can plaintiff prove the first element of the test that the nature of the losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy. *Id.* It is clear from the filings that plaintiff has significant records of its costs of contract performance. *See, e.g.,* Pl.'s Opp. at 31. The failure of proof on two elements is fatal to plaintiff's claim of entitlement to utilize the total cost method of recovery. Because plaintiff has not carried its burden, the court cannot permit the computation of damages using the total cost method. *See Servidone*, 931 F.2d at 862.

The fact that plaintiff failed properly to compute damages is not fatal to its entire damages claim, however. This court has jurisdiction over claims when the factual basis of the claim before this court is identical to the claim which was certified to the contracting officer. *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 54 (1983). Here, the claim before both the court and the contracting officer is for delay damages at Big Caliente. *See* J.A. at 324 (letter from Ryco to Contracting Officer regarding intent to file claim to recover for delay damages); Compl. *passim.* Plaintiff is not precluded from modifying the amount of its claim or from proffering new evidence in support of its claim. *Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 540 (1993); *accord Concrete Placing Co. v. United States*, 25 Cl.Ct. 369, 378 (1992). Plaintiff may prove its damages at trial by proving the actual increased costs to which it is entitled, provided that such costs accrued on or after October 12, 1998.

## H. Unabsorbed indirect costs

When the government suspends performance of a contract, indirect costs such as home office expenses can accrue beyond the amount the contractor originally planned for when bidding the contract. *West v. All State Boiler, Inc.*, 146 F.3d 1368, 1372 (Fed. Cir.1998). When this occurs, the indirect costs are "unabsorbed." The Federal Circuit has adopted the "Eichleay formula" as the appropriate method to calculate the amount of unabsorbed indirect costs that can be recovered after a suspension of performance caused by the government. *C.B.C. Enters., Inc. v. United States*, 978 F.2d 669, 674 (Fed.Cir.1992). Before the Eichleay formula can be used, however, the plaintiff must meet two prerequisites: 1) that the contractor be on standby and 2) that the contractor be unable to take on other work. *All State*, 146 F.3d at 1373 (citing *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1056 (Fed.Cir.1993)).

A contractor is on standby when work is suspended for an uncertain amount of time and the contractor can be required to come back to work at any time. *All State*, 146 F.3d at 1373. "The proper standby test focuses on the delay or suspension of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform." *Id.* (citing *Interstate*, 12 F.3d at 1058).

■ Defendant argues that plaintiff cannot show it was on standby during the suspension. Specifically, defendant argues that during the winter shutdowns plaintiff was no longer mobilized at the site and could not be called back until the following construction season. Def.'s Mot. at 26. Defendant further argues that because of the small number of its employees at the site at any given time, plaintiff cannot now argue that it kept its workers on standby. Def.'s Reply at 19.

Plaintiff argues that it was on standby because, when work was suspended in October, 1996, there was no indication of when work would begin again. Pl.'s Opp. at 35. According to plaintiff, the additional time needed to complete the work was unknown, but Ryco still had to "remain ready, willing, and able to work immediately on Big Caliente whenever the suspension was lifted." *Id.* at 36.

The court agrees with defendant that plaintiff was not on standby during the winter shutdowns. Work order no. 4 for example, which suspended work in August of 1997, stated that plaintiff was not to begin work at Big Caliente during "this construction season." J.A. at 269. Once work was shut down for the winter, plaintiff could not have been on standby until the following season.

■ The court cannot, on the basis of the evidence currently before it, find that plaintiff was not on standby during the remaining portions of construction seasons. It is a triable issue whether plaintiff was on standby during those periods in which it was not prevented from working due to the winter shutdown. At trial, both parties will be able to present evidence as to whether this suspension was for an uncertain amount of time, and whether plaintiff was required to remain ready to perform. *See All State,* 146 F.3d at 1373.

The second Eichleay prerequisite is that the contractor be unable to take on other work. To meet this burden, the contractor must show that it was impractical for it to take on other work during the suspension. *All State,* 146 F.3d at 1374. Defendant argues that plaintiff cannot show it was impractical for it to take on additional work while it was on standby. Defendant argues that, af-

ter the August 26, 1997 work order, plaintiff increased the number of man-hours and the number of workers it utilized on the project. Def.'s Mot. at 27. According to defendant, this evidence shows that Ryco's workers were fully employed performing work at one or more of the other nineteen project work sites right up until the 1997 winter shutdown. *Id.*

Plaintiff argues that having its workers on standby limited its ability to work perform other work, and that it was forced to maintain two 100% bonds for approximately three years, thereby reducing its bonding capacity for that time. Pl.'s Opp. at 36. This reduction in bonding capacity, plaintiff argues, limited its ability to bid on other jobs for the duration of the suspension. *Id.* Plaintiff asserts that defendant "simply argues (without providing evidence) that plaintiff could take on other work. At best, this is a triable issue which militates against summary judgment." *Id.*

The Federal Circuit has noted that the mere fact that a contractor can take on some additional work is not sufficient to eliminate Eichleay damages as a possible means of recovery. *Melka Marine, Inc. v. United States,* 187 F.3d 1370, 1376–77 (Fed.Cir. 1999). Additionally, the Federal Circuit has noted that a contractor can have some excess bonding capacity and still qualify for Eichleay damages. *All State,* 146 F.3d at 1375. Because plaintiff had reduced bonding capacity, an inference can be drawn that it was impractical for it to take on additional work. The court agrees with plaintiff that whether it was impractical for plaintiff to take on other work during any time it may have been on standby is a triable question.

Assuming that plaintiff can utilize the Eichleay formula, defendant argues that plaintiff did so improperly in this case. The components of the Eichleay formula have recently been summarized by this court as follows:

1) to find the allocable contract overhead, multiply the total overhead cost incurred during the contract period times the ratio of billings from the delayed contract to

total billings of the firm during the contract period;

2) to get the daily overhead rate, divide the allocable contract overhead by days of contract performance; and

3) to get the amount recoverable, multiply the daily contract overhead rate times days of government-caused delay.

*Nicon, Inc. v. United States,* 51 Fed Cl. 324, 326–27 (2001), appeal granted, 54 Fed.Appx. 495 (Fed.Cir.2002) (citing *Capital Elec. Co. v. United States,* 729 F.2d 743, 747 (Fed.Cir. 1984)).

 The dispute in this case arises primarily over the computation of the second step in the formula, the daily overhead rate. Plaintiff computed the daily overhead rate by dividing the fixed overhead allocable to the contract by the original number of days of performance, 168. J.A. at 369. This method is not authorized by the Eichleay formula, which requires that the daily overhead rate be determined by dividing the allocable contract overhead by the actual days of performance. *Capital Elec.,* 729 F.2d at 747.

Defendant argues that, by reducing the divisor, plaintiff is producing an artificially high daily contract rate. Def.'s Mot. at 27. Defendant claims that plaintiff should have divided the fixed overhead allocable to the contract by the total days of performance, in this case 1,129, as the Federal Circuit did in *C.B.C. Id.* at 28. Defendant's calculation also appears to misapply the Eichleay formula, because defendant uses the number of days during "the contract period" (the number used in the first step of the formula), rather than the actual days of contract performance, which is the different (and, *a fortiori,* smaller) number used in the second step of the formula. If the court does apply the Eichleay formula in this case, it could only be on the basis of the actual days of contract performance, as proven at trial.

Finally, the court notes that plaintiff has conceded that it did not begin to incur increased costs until October 12, 1998. PPFUF ¶ 33; Pl.'s Opp. at 21–22. At oral argument, plaintiff attempted to distinguish delay damages from Eichleay damages, arguing that "home office overhead ... is a concept that is separate from cost in the generic sense." Tr. at 58. However, plaintiff was unable point to any authority that supports this distinction. The parties shall, in their pre-trial filing, brief the issue of whether plaintiff's concession on costs should also bar any portion of its Eichleay claim accruing before October 12, 1998.

III. Conclusion

For the foregoing reasons, summary judgment is DENIED as to access to the construction site, GRANTED as to the winter shutdowns, DENIED as to the defenses of accord and satisfaction and act of government, and GRANTED IN PART and DENIED IN PART as to notice, the method of computing damages and Eichleay damages. Defendant's motion to strike as to the declaration of Patrick Ryan is GRANTED IN PART and DENIED IN PART and is MOOT IN PART. Defendant's motion to strike as to the declaration of Dan Peterson is MOOT. On or before Wednesday, January 15, 2003, the parties shall file with the court a joint status report or, if they cannot agree, separate status reports, proposing further proceedings in this matter.

IT IS SO ORDERED.